**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| QVL PHARMACY HOLDINGS, INC. | § | Case No. 15-14983 |
|    Debtor | § | Chapter 11 |

**OBJECTIONS TO THIRD AMENDED PLAN OF
REORGANIZATION DATED NOVEMBER 7, 2016**

TO THE HONORABLE FRANK J. BAILEY, U.S. BANKRUPTCY JUDGE:

Asclepius Panacea, LLC, Asclepius Panacea GP, LLC, Daily Pharmacy, LLC, and Daily Pharmacy GP, LLC (collectively "**AP**") file these objections to the Third Amended Plan of Reorganization Dated December 7, 2016 (the "**Plan**") filed by debtor QVL Pharmacy Holdings, Inc. (the "**Debtor**"). The Court should deny confirmation of the Plan because it does not meet the requirements of 11 U.S.C. § 1129. Among other deficiencies, the Plan: (1) impermissibly provides more favorable treatment to unsecured claims of creditors represented by the Plan proponent than other unsecured claims; and (2) wrongfully subordinates the full amount of AP's claims, the majority of which do not arise from AP's purchase of equity interests in the former subsidiaries of the Debtor. AP also objects to confirmation to the extent that the Debtor cannot provide evidence to show compliance with each of the requirements of section 1129 of the Bankruptcy Code.

**I.     ARGUMENT**

*A. The Plan does not treat similarly situated creditors equally by classifying the unsecured claims of the 2011 Noteholders and the 2013 Noteholders as secured and by providing the Line of Credit Lender with a secured note that far exceeds the value of its secured claim.*

1.     The Plan cannot be confirmed because it fails to treat creditors with the same legal rights in the same manner and impermissibly gives more favorable treatment to certain unsecured creditors represented by the Plan proponent. The "preferred creditors" are also equity

1

security holders who are funding the Plan and are the primary beneficiaries of the intended "reorganization" of the Debtor.

2.      To be confirmed, a must comply with the applicable provisions of Title 11. 11 U.S.C. § 1129(a)(1).  Section 1123(a)(4) of the Bankruptcy Code provides that a plan must "provide the same treatment of each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment…."

3.      White Winston Select Asset Funds LLC ("**White Winston**"), acting for itself and as collateral agent for three groups of lenders, is the principal creditor of the Debtor and the principal Plan proponent.  *See* Third Amended Disclosure Statement (the "**Disclosure Statement**") at 18, Art. III(D)(5).  White Winston has funded all of the Debtor's postpetition expenses (without prior Court approval), and, through the Plan, it intends to provide the Debtor with exit financing and to fund the Liquidation Trust ("**Trust**") by releasing its lien on the Debtor's accounts receivable ("**A/R**") and backstopping the Trust's gross recovery on the A/R up to the maximum amount of $100,000.00.  Plan at 7 and 14, §§ 2.45, 6.2(c); Disclosure Statement at 16, § III(C)(8)(d).

4.      White Winston filed three "secured" proofs of claim (the "**Claims**") as collateral agent for three groups of lenders (which presumably include White Winston), which the Debtor refers to in the Disclosure Statement as the "Line of Credit Lender," the "2011 Noteholders," and the "2013 Noteholders."  *See* Disclosure Statement at 3, Art. II(B).  All such creditors are also shareholders of the Debtor.  *Id*. at 3 and 17, Art. II(B) and III(D)(2).  The Disclosure Statement also explains that, pursuant to a subordination agreement executed in 2013, the 2011 Noteholders agreed to subordinate their debt to the Line of Credit Lender and to the 2013 Noteholders, which, in turn, agreed to subordinate their debt to the Line of Credit Lender.  *Id*. at 3, Art. II(B)(4)(b).

2

5.     In Claim No. 20, White Winston asserts a claim on behalf of the Line of Credit Lender in the amount of $1,459,925.88, including $300,000.00 for attorney's fees. Claim No. 20 alleges that the value of the collateral securing the debt (*i.e.*, all of the Debtor's "Personal property assets") is $1,227,094.00, therefore that amount of Claim No. 20 is secured and the remaining $232,831.88 is unsecured. *See* 11 U.S.C. § 506(a)(1). In fact, according to the Debtor, the net liquidation value of all its assets is only $83,300.00. *See* Exhibit B to the Disclosure Statement. Therefore, the unsecured portion of the Line of Credit Lender's Claim is actually $1,376,625.88. In Claim No. 21, White Winston asserts a "secured" claim on behalf of the "2011 Noteholders" in the amount of $1,862,047.17. Claim No. 21 also alleges that the value of the collateral securing the debt is $1,227,094.00, but concedes that the amount of the claim that is secured is $0.00, *meaning that the entirety of Claim No. 21 is unsecured under section 506(a)(1)*. In Claim No. 22, White Winston asserts a "secured" claim on behalf of the "2013 Noteholders" in the amount of $3,340,251.11. Claim No. 22 also alleges that the value of the collateral securing the debt is $1,227,094.00, but concedes that the amount of the claim that is secured is $0.00, *meaning that the entirety of Claim No. 22 is also unsecured under section 506(a)(1)*.

6.     Despite the fact that the Claims of the 2013 Noteholders and the 2011 Noteholders are wholly and completely unsecured, the Plan treats those Claims as secured and gives them more favorable treatment than all of the other general unsecured claims, which are separately classified and impaired. Plan at 11-13, Arts. IV-V. Moreover, it appears to treat the Line of Credit Lender as completely secured despite the absence of an election under 11 U.S.C. § 1111(b). The Plan creates four classes of secured claims: (1) Class 1A - General Secured Claims; (2) Class 1B - White Winston Select Asset Funds LLC, as agent for QVL Pharmacy

3

Subsidiaries Funding Group, LLC (*i.e.*, the Line of Credit Lender); (2) Class 1C - White Winston Select Asset Funds LLC, as agent for 2013 Noteholders; and (4) Class 1D - White Winston Select Asset Funds LLC, as agent for 2011 Noteholders. *Id*. at 11-12, Art. V § 5.1.

7.      Under the Plan, the Line of Credit Lender and the 2013 Noteholders would receive their "Pro Rata Share of a $6.0 Million note secured by a lien on all of the Reorganized Debtor's property." *Id*. at 12, Art. V § 5.1(b)-(c). The Line of Credit Lender and the 2013 Noteholders will then have the full amount of their prepetition debts paid off through a new Credit Facility funded by White Winston at Plan confirmation. Disclosure Statement at 17, Art. III(D)(a). The 2011 Noteholders would receive the full amount due under their respective notes as of the Petition Date, "paid by the Debtor's issuance of the number of shares of Reorganized Debtor's common stock in the Reorganized Debtor to such holder, with such Reorganized Debtor's common stock issued at $.10 per share." Plan at 12, Art. V § 5.1(d)(ii).

8.      The Plan defines "Pro Rata Share" as:

> … on any Distribution Date, with respect to the holder of an Allowed Claim against or an Allowed Equity Interest in the Debtor's estate, the percentage represented by a fraction, (a) the numerator of which shall be an amount equal to such holder's Claim against or Equity Interest in the Debtor's estate; and (b) the denominator of which shall be an amount equal to the aggregate amount of Allowed, Disputed and estimated Claims or Equity Interests in the same Class as such holder's Claim or Equity Interest, against or in the Debtor's estate.

Plan at 8, Art. II § 2.57. Although the Line of Credit Lender and the 2013 Noteholders are in different Classes, presumably there is only one $6 million note in which they will share proportionately based on the amount of their Claims. Assuming that is the case, the Line of Credit Lender would receive a secured note for $1,740,000.00 based on its secured claim of $83,300.00 and its unsecured claim of $1,376,625.88, and the 2013 Noteholders would receive a

4

secured note for $4,260,000.00 based on their unsecured claim of $3,340,251.11.[1] The 2011 Noteholders would receive 100% of the outstanding equity interests in the Reorganized Debtor based on their unsecured claim of $1,862,047.17.[2] *See* Plan at 12, § 5.2(d)(ii); Disclosure Statement at 17, Art. III(D)(2)(a).

9.   In contrast, Class 3 Allowed Unsecured Claims would receive a "Pro Rata Share of Distributions from the Liquidating Trust." Plan at 12-13, Art. V § 5.3(b). The Liquidating Trust's primary asset will be the Debtor's accounts receivable ("**A/R**"), which will be transferred to the Liquidating Trust free and clear of any liens held by the Line of Credit Lender, the 2013 Noteholders, and the 2011 Noteholders. Plan at 14, Art. VI § 6.1; Disclosure Statement at 20-21, Art. V(A). White Winston has also agreed to make a "Floor Payment" in the maximum amount of $100,000.00 to ensure that the gross amount of cash in the Liquidating Trust available for distribution, before deductions for the Litigating Trust's expenses (including the unspecified fees to be charged by the Litigating Trustee and any of his retained professionals), is 15% of the A/R, or $113,148.60. Plan at 7 and 14, Art. II § 2.45 and Art. VI § 6.2(c); Disclosure Statement at 16, § III(C)(8)(d). Even disregarding AP's claims (as the Plan does), the allowed unsecured claims totaling over $400,000.00 will only receive a small fraction of the face value of their claims. *See* Disclosure Statement at 24, Art. VIII(C).

---

[1] The combined total of the Line of Credit Lender's Claim and the 2013 Noteholders' Claim is $4,716,876.99, of which the Line of Credit Lender's Claim for $1,376,625.88 accounts for 29% and the 2013 Noteholders' Claim for $3,340,251.11 accounts for 71%. 29% of $6 million equals $1,740,000.00, and 71% equals $4,260,000.00.

[2] The Disclosure Statement states that the "equity control of QVL will not change" because: "Currently, the holders of the 2011 Notes and 2013 Notes collectively own 55.3% of QVL's equity. Following the conversion of the 2011 Notes, these same shareholders will then own 100% of QVL's equity." Disclosure Statement at 17, § D(2)(a). The Plan proposes to cancel all outstanding equity interests and to issue new shares of common stock to the 2011 Noteholders. Plan at 12, 14, §§ 5.1(d)(ii) and 5.5(b). Unless the 2011 Noteholders currently own greater than 50% of the 55.3% collectively owned with the 2013 Noteholders, equity control of the Debtor *will* change. This would bar the Reorganized Debtor from using the Debtor's net operating losses to shield future income from taxation, which White Winston has alleged is the principal motive for its funding millions of dollars toward a reorganization rather than simply foreclosing on the Debtor's assets and developing the "Quick Scan" technology for the secured lender itself. *See* 26 U.S.C. § 269(a)(1); 26 C.F.R. § 1.269-3(d)-(e).

4825-0605-6767.1

10. The special treatment given to the Line of Credit Lender, the 2011 Noteholders, and the 2013 Noteholders violates section 1123(a)(4) and therefore section 1129(a)(1)'s mandate that the Plan comply with all applicable provisions of Title 11. Accordingly, the Court should deny confirmation of the Plan.

*B. The Plan wrongfully subordinates the portions of AP's claims that do not arise from their purchase of equity interests in the Debtor's subsidiaries.*

11. The Plan cannot be confirmed because it wrongfully subordinates all of AP's claims under 11 U.S.C. § 510(b). Although AP's claims for damages for fraud arising from its purchase of the Debtor's partnership interests in two subsidiaries (the "**Subsidiaries**") are subject to mandatory subordination, AP's claims for other damages for breach of contract, conversion, money had and received, and tortious interference with existing contract are not.

12. Section 510(b) requires subordination of "a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, [or] for damages arising from the purchase or sale of such a security." This provision is intended to prevent attempts by the debtor's shareholders to recoup their investment by asserting claims that would afford them creditor status, thereby circumventing the absolute priority rule. *In re Granite Partners, LP*, 208 B.R. 332, 336 (Bankr. S.D.N.Y. 1997). Section 510(b) is intended to recognize the differing levels of risk and reward assumed by shareholders and creditors. *Id.* In exchange for the opportunity to participate in profits, an equity holder takes the risk that his ownership interest may be wiped out first if the entity becomes insolvent. *Id*. In contrast, a creditor agrees to be repaid a fixed amount and, in so doing, relies on the existence of an "equity cushion" to ensure repayment if the entity becomes insolvent. *Id.*

13. Because section 510(b)'s use of the term "arising from" is ambiguous, courts look to the policies underlying the statute to determine whether subordination is appropriate under the

circumstances. *See In re Med Diversified, Inc.*, 461 F.3d 251, 255 (2d Cir. 2006); *In re Telegroup, Inc.*, 281 F.3d 133, 138 (3rd Cir. 2002). Mandatory subordination under section 510(b) may extend to a claim arising from "post-issuance conduct, such as breach of contract." *In re SeaQuest Diving, LP*, 579 F.3d 411, 421 (5th Cir. 2009) (citing *Telegroup*, 281 F.3d at 140, 142). Clearly, there must be "some nexus or causal relationship between the claim and the sale" for section 510(b) to apply. *SeaQuest*, 579 F.3d at 421 (citing *Telegroup*, 281 F.3d at 138). But a "mere 'connection' between the claim and the purchase or sale of a security is not enough to support a finding that the claim 'arises from' the purchase or sale and should be subordinated unless the purposes of the statute would be served thereby." *In re CIT Group Inc.*, 460 B.R. 633, 640 (Bankr. S.D.N.Y. 2011); *In re Enron Corp.*, 341 B.R. 141, 156, n. 12 (Bankr. Del. 2006) (recognizing that a claim may be "directly related to the sale of a security" yet still not "'arise from' that sale" under section 510(b)). In determining whether subordination would serve the policies underlying section 510(b), the key question is whether the claim at issue seeks to recover some or all of the claimant's equity investment. *See SeaQuest*, 579 F.3d at 421; *Telegroup*, 281 F.3d at 142.

14. In *Telegroup*, the claimants filed claims based on the debtor's breach of a provision in a prepetition stock purchase agreement requiring the debtor to "use its best efforts to register its stock and ensure that the shares were freely tradeable" by a date certain. 281 F.3d at 136. The claimants argued that, if the debtor had performed as promised, they would have been able to sell their shares before they declined in value. *Id*. The Third Circuit determined that the subordination was appropriate because the claimants were seeking to recover the lost value of their investment. *Id*. at 142. The court noted, however, that not every claim brought by a shareholder should be subordinated:

7

> Nothing in our rationale would require the subordination of a claim simply because the identity of the claimant happens to be a shareholder, where the claim lacks any causal relationship to the purchase or sale of stock and when subordinating the claims would not further the policies underlying § 510(b), which was intended to prevent shareholders from recovering their equity investment in parity with general unsecured creditors.

281 F.3d at 144, n.2. Along these lines, the court in *In re Worldcom, Inc.* observed that "[o]bviously, owners of securities of the debtor may also hold a variety of claims against the debtor not derived from their purchase or sale of securities," citing as examples an equity holder who is injured by a company vehicle, who is a party to supply contract breached by the debtor, or who loans money to the debtor. 329 B.R. 10, 14, n. 2 (Bankr. S.D.N.Y. 2005).

15. Where the shareholder's claim is only tangentially related to the stock purchase and his damages do not relate to the value of his investment, section 510(b) does not apply. *See Stucki v. Orwig*, Civ. Action No. 3:12-CV-1064-L, 2013 WL 1499377 (N.D. Tex. Apr. 12, 2013). In *Stucki*, shareholders filed claims based on the debtor's breach of a settlement agreement requiring the debtor to make distributions to shareholders. *Id*. at *5. As the *Stucki* court observed, the breach of contract claims "should not be subject to mandatory subordination merely because the claimants are shareholders." *Id*. at *5 (citing *Telegroup*, 281 F.3d at 144, n.2; *Raven Media Inv. v. DirecTV Latin Am., LLC (In re DirecTV Latin Am., LLC)*, No. 03-10805(PJW), Civ. 03-981-SLR, 2004 WL 302303, at *3 (D. Del. Feb. 4, 2004)). The shareholders' claim was not related to any breach or fraud committed in connection with their stock purchase agreement, nor did they seek to recoup the value of their equity investment. *Id*. at *5-6. Rather, the claim was based on the debtor's breach of a post-issuance settlement agreement requiring the debtor to make shareholder distributions. *Id*. at *6. Consequently, the Court found that the "connection or causal relationship" between the claim and the stock purchase was "too attenuated to bring it within § 510(b)'s reach." *Id*.

8

16. Other courts have refused to apply section 510(b) to claims based on the debtor's breach of ancillary agreements executed in connection with an equity transaction when the claimant's damages have no relation to the value of his equity interest. In *DirecTV Latin America*, the shareholder, Raven, owned a controlling interest in one of the debtor's subsidiaries. *See* 2004 WL 302303, at *1. The debtor and Raven entered into a stock purchase agreement under which the debtor bought Raven's interest in the subsidiary in exchange for a minority equity interest in the debtor and Raven's option to force the debtor's cash purchase of that interest under a "Put Agreement." *Id*. at *1-2. After the Put Agreement was triggered, the debtor filed for bankruptcy and sought to subordinate Raven's damages claim under section 510(b). *Id*. at *2. The court found that Raven's claim was "neither predicated on misleading statements nor measured by diminished share value." *Id*. at *4. The court concluded that subordination of Raven's claim would not be appropriate because the "anti-bootstrapping intent of § 510(b)" would not be "served by imposing the risk of business failure on a party that unequivocally did not contract for it." *Id*.

17. In *In re NationsRent, Inc.*, the claimants transferred their interests in certain companies acquired by the debtors prepetition in exchange for stock in the debtors, cash, promissory notes, and a "Make-Whole Agreement" requiring the Debtors to pay specified amounts (the "**Make-Whole Amounts**") based on the value of the debtors' stock on the third anniversary of the acquisition. 381 B.R. 83, 86 (Bankr. D. Del. 2008). The Court found that the claimants were not "speculating on the success of the Debtors" and that the Make Whole Amounts were simply "claims to recover payment due under agreements for the sale of businesses." *Id*. at 92. Therefore, the claims were not subject to mandatory subordination under section 510(b). *Id*. Likewise, in *CIT Group*, the court found that claims for breach of a side

9

4825-0605-6767.1

letter agreement executed as part of a stock sale were not subject to subordination. 460 B.R. at 636, 638-39. In exchange for purchasing its own stock from the claimant, Tyco, the debtor agreed to pay Tyco the value of any tax benefits obtained as a result of net operating losses accrued prior to the sale. *Id*. at 636. Although the court acknowledged that there was undoubtedly a causal connection between the stock sale and Tyco's claim, the court held that Tyco's claim could not be subordinated because "Tyco contracted for the status of a creditor and not a holder of equity." *Id*. at 639.

18. AP's original and amended proofs of claim Nos. 29-32 (the "**AP Proofs of Claim**") are based on the claims asserted in the "Texas Lawsuit" (as described in Art. II(E) of the Disclosure Statement) against the Debtor in Plaintiffs' First Amended Petition attached as Exhibit A to the AP Proofs of Claim. As explained in the addenda to the AP Proofs of Claim, AP's claims can be broken down into three distinct parts for the purpose of determining whether subordination is appropriate under section 510(b): (1) AP's claims totaling $716,851.35 for common law and securities fraud arising from AP's purchase of the Subsidiaries; (2) AP's claims totaling $959,601.52 for breach of the Transition Services Agreement ("**TSA**"), conversion, and money had and received arising from the debtor's misappropriation of the proceeds from AP's pharmaceutical sales, which the debtor retained for itself rather than remitting those funds to AP as required under the TSA and common law; and (3) AP's claims totaling $50,000.00 for tortious interference with AP**'**s loan agreement and promissory note with White Winston. *See* Addenda to AP Proofs of Claim.

19. AP concedes that the damages arising from its fraud claims are subject to subordination under section 510(b). However, AP's non-fraud claims totaling over $1 million do not arise from its equity purchase and therefore should not be subordinated. The TSA was a

10

separate agreement by which AP could continue to operate the Subsidiaries using their existing licensing and supply contracts while AP applied for its own license. Under the TSA, the Debtor would continue to collect receipts from third-party payors for post-transaction sales, deposit those receipts in a lock-box account for the benefit of AP, then remit those receipts to AP after deducting certain agreed-upon administrative expenses. Instead, the Debtor simply kept AP's money for itself. AP's damages claims for breach of the TSA, conversion, and money had and received have nothing to do with the value of the equity interests it purchased in the Subsidiaries. AP is not attempting to recoup the lost value of that investment; it is simply trying to recover the revenues generated by AP's sales that were misappropriated by the Debtor. Subordinating these claims would not serve the policies underlying section 510(b) and should not be allowed. Similarly, AP's claim for tortious interference with its loan agreement and promissory note with White Winston do not arise from its purchase of the debtor's equity interests in the subsidiaries. AP alleges that the Debtor wrongfully declared a default by AP under the TSA, which caused White Winston to refuse to honor the $50,000.00 prepayment discount under AP's promissory note. Again, AP's tortious interference damages do not relate to the value of its investment in the Subsidiaries, but rather the additional funds it was required to pay White Winston due to the Debtor's tortious acts. This portion of AP's claim should not be subordinated either.

20. Although courts should be wary of shareholders' efforts to "'lay aside the garb of the shareholder … to assume the role of creditor,'" they should also "guard[] against the attempts by a bankruptcy debtor to clothe a general creditor in the garb of a shareholder." *Med Diversified*, 461 F.3d at 258 (quoting *Matter of Stirling Homex Corp.*, 579 F.2d 206, 213 (2nd Cir. 1978)); *CIT Group*, 460 B.R. at 643. In its schedules, the Debtor itself recognizes that not all of AP's claims arise from its purchase of the subsidiaries. In Schedule F, the Debtor lists two

11

separate claims in favor of AP: (1) a claim for $1,035,781.00 based on "Litigation Claims"; and (2) a claim for $60,000.00 based on "Transition Service Agreement Obligations." Doc. # 96-3, Ex. C at 5. By subordinating the entirety of AP's claims in the Plan, the Debtor ignores AP's dual status as both an equity holder in the Subsidiaries and as a general creditor. Because AP's non-fraud claims do not arise from its purchase of the Subsidiaries, those claims (totaling $1,009,601.52) should not be subordinated and should be treated as general unsecured claims.

## II.    CONCLUSION

AP respectfully requests that this Court deny confirmation of the Plan for failure to comply with 11 U.S.C. § 1129. AP does not believe that the Debtor can prove compliance with each of the elements of section 1129. At a minimum, this Court, upon its independent analysis of each element necessary for confirmation, must find that the Plan violates sections 1123(a)(4) and 1129(a)(1) by providing special treatment to the Line of Credit Lender, the 2011 Noteholders, and the 2013 Noteholders (all of which are represented by the Plan proponent White Winston) to the detriment of general unsecured creditors. The Plan also impermissibly subordinates all of AP's claims even though portions of those claims totaling over $1 million do not arise from AP's purchase of the Debtor's interests in the Subsidiaries.

Respectfully submitted,

By: /s/ Eric J. Taube
Eric J. Taube
PHV 19679350
Cleveland R. Burke
PHV 24064975
WALLER LANSDEN DORTCH & DAVIS, LLP
100 Congress Avenue, Suite 1800
Austin, Texas 78701
(512) 685-6400
(512) 685-6417 (FAX)
eric.taube@wallerlaw.com
cleveland.burke@wallerlaw.com

ATTORNEYS FOR ASCLEPIUS PANACEA, LLC, ASCLEPIUS PANACEA GP, LLC, DAILY PHARMACY, LLC, DAILY PHARMACY GP, LLC

**CERTIFICATE OF SERVICE**

The foregoing pleading was served electronically on all parties receiving the Court's ECF notices in this case, including counsel for the Debtor as listed below, on December 27, 2016.

**Counsel to the Debtor**
Stephen F. Gordon
Todd B. Gordon
Katherine P. Lubitz
The Gordon Law Firm LLP
River Place
57 River Street
Wellesley, MA 02481

/s/ Eric J. Taube
Eric J. Taube

13

4825-0605-6767.1